**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NOTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ARTISHA CARROLL, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| LCA-VISION, Inc., also d/b/a LASIKPLUS, | |
| Defendant. | |

Plaintiff Artisha Carroll ("Plaintiff"), brings this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant LCA-Vision, Inc. d/b/a LasikPlus ("Defendant" or "LasikPlus"). Plaintiff brings this action based on personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. This is a class action suit brought on behalf of all patients who visited lasikplus.com (the "Website") to book consultations for laser vision correction procedures.[1]

2. Defendant is a healthcare provider for Laser-Assisted In Situ Keratomileusis ("LASIK"), "partner[ing] with some of the most experienced LASIK surgeons in the United

---

[1] Defendant offers a variety of laser vision procedures including PresbyVision, photorephractive keratectomy (PRK) surgery, wavefront-optimized lasik, contoura lasik, and all-laser lasik procedures. *Vision Correction Procedures*, LASIK MD VISION, (last visited July 29, 2024), https://www.lasikmd.com/procedures/laser-procedures.

States."[2]  Such procedures are performed to treat a variety of health conditions affecting vision, including Myopia, Hyperopia, and Astigmatism.[3]

3.       When booking medical services online, patient privacy is crucial.  Patients expect, as they should, that their information will be held in confidence and not shared with third parties without their knowledge or consent.

4.       Moreover, information concerning an individual's healthcare, including medical procedures, is protected by state and federal law.  Despite these protections and Defendant's duty as a healthcare provider, Defendant aided, employed, agreed, and conspired with Facebook[4] to intercept communications sent and received by Plaintiff and Class Members, including communications containing protected medical information.

5.       Plaintiff brings this action on behalf of herself and the Class (as defined below) for equitable relief and to recover damages and restitution for: (i) violation of the Electronic Communications Privacy Act ("ECPA") 18 U.S.C. § 2511(1), *et seq.*; and (ii) negligence.

## PARTIES

6.       Plaintiff is an Illinois citizen who resides in Chicago, Illinois.  At all relevant times, Plaintiff maintained an active Facebook account.

7.       In or around November 2023, Plaintiff booked a consultation for LASIK surgery through Defendant's Website.  Unbeknownst to Plaintiff, Defendant assisted third parties with intercepting sensitive information pertaining to her LASIK surgery consultation.

---

[2] https://www.lasikplus.com/experience/

[3] https://www.lasikplus.com/lasik-eye-surgery/

[4] In October 2021, Facebook, Inc. changed its name to Meta Platforms, Inc. Unless otherwise indicated, Facebook, Inc. and Meta Platforms, Inc. are referenced collectively as "Facebook."

8.      Pursuant to the systematic process described herein, Defendant assisted Facebook with intercepting Plaintiff's communications, including those that contained individually identifiable health information. Defendant assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization. As a consequence, Plaintiff has received targeted advertisements on Facebook.

9.      By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and protected health information.

10.      Defendant LCA-Vision, Inc. is an Ohio corporation with its principal place of business at 7840 Montogomery Road, Cincinnati, OH 45236. Defendant owns and operates the Website lasikplus.com.  At all relevant times hereto, Defendant embedded a software code known as the Facebook Tracking Pixel on its Website, as described in more detail below. Defendant embedded this tracking technology on its Website for advertising purposes. Defendant maintains healthcare facilities for providing LASIK surgery nationwide.

## JURISIDICTION AND VENUE

11.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq* ("ECPA"). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.  Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from at least one defendant.

12.      This Court has personal jurisdiction over Defendant because Defendant conducts

substantial business in this District.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred within this District.

## FACTUAL ALLEGATIONS

### A.     Warning on Tracking Codes on Health Care Websites

14.     Defendant assisted Facebook with intercepting information that is sensitive, confidential, and personally identifiable.

15.     Defendant is a healthcare company that hosts a website to connect patients with therapists for mental health treatment.

16.     Under federal law, a healthcare provider may not disclose PII or PHI without the patient's express written authorization.[5]

17.     The United States Department of Health and Human Services ("HHS") has established a national standard, known as the HIPAA Privacy Rule, to explain the duties healthcare providers owe to their patients.  "The Rule requires appropriate safeguards to protect the privacy of [PHI] and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization."[6]

18.     A healthcare provider violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-d9 ("Part C"): "(1) uses of causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual."[7]

19.     The statute states that an entity "shall be considered to have obtained or disclosed

---

[5] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 165.508(a), 164.514(b)(2)(i).

[6] U.S. Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

[7] 42 U.S.C. § 1320d-6.

individually identifiable health information in violation of [Part C] if the information is
maintained by a covered entity…and the individual obtained or disclosed such information
without authorization." *Id.*

20.     The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to
Defendant when it is knowingly disclosing individually identifiable health information relating
to its patients.

21.     Defendant further failed to comply with other HIPAA safeguard regulations as
follows:

      a.    Failing to ensure the confidentiality and integrity of electronic PHI that
Defendant created, received, maintained and transmitted in violation of 45
C.F.R. Section 164.306(a)(1);

      b.    Failing to implement policies and procedures to prevent, detect, contain
and correct security violations in violation of 45 C.R.F. Section
164.308(a)(1);

      c.    Failing to identify and respond to suspected or known security incidents
and mitigate harmful effects of security incidents known to Defendant in
violation of 45 C.F.R. Section 164.308(a)(6)(ii);

      d.    Failing to protect against reasonably anticipated threats or hazards to the
security or integrity of electronic PHI in violation of 45 C.F.R. Section
306(a)(2);

      e.    Failing to protect against reasonably anticipated uses of disclosures of
electronic PHI not permitted under privacy rules pertaining to individually
identifiable health information in violation of 45 C.F.R. Section

164.306(a)(3); and

    f.    Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. Section 164.530(c).

22.    Health care organizations regulated under HIPAA, like Defendant, may use third-party tracking tools, such as the Facebook Tracking Pixel, *in a limited way* to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to vendors. As explained by a statement published by the HHS:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. **For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures**.[8]

23.    The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[9]

---

[8] HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (THE "BULLETIN") (EMPHASIS ADDED), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[9] *Id.* (emphasis added).

24.     Plaintiff and Class Members face exactly the risks about which the government expresses concern.  Defendant's unlawful conduct resulted in third parties intercepting information regarding Plaintiff and Class Members scheduling consultations on the Website.

25.     The Bulletin goes on to make clear how broad the government's view of protected information is.  It explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, **or any unique identifying code**.[10]

26.     Crucially, that paragraph in the government's Bulletin continues:

> All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.  This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[11]

27.     Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.
>
> "When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third

---

[10] *Id.* (emphasis added).

[11] *Id.* (emphasis added).

parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

"Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.[12]

28.      Therefore, Defendant's conduct, as described more thoroughly below, is directly contrary to federal law and the clear pronouncements by the FTC and HHS.

**B.      Facebook's Platform and Business Tools**

29.      Facebook describes itself as a "real identity platform," meaning users are allowed only one account and must share "the name they go by in everyday life." To that end, when creating an account, users must provide their first and last name, along with their birthday and

---

[12] Federal Trade Commission, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, July 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

gender.

30.     In 2023, Facebook generated over $134 billion in revenue.   With respect to the apps offered by Facebook, substantially all of Facebook's revenue is generated by selling advertising space.

31.     Facebook sells advertising space by highlighting its ability to target users. Facebook can target users so effectively because it surveils user activity both on and off its website.   This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."   Facebook compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.

32.     Advertisers can also build "Custom Audiences."   Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."   With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."   Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data. They can do so through two mechanisms: by manually uploading contact information for customers or by utilizing Facebook's "Business Tools."

33.     As Facebook puts it, the Business Tools "help website owners and publishers, app developers, and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."   Put more succinctly, Facebook's Business

Tools are bits of code that advertisers can integrate into their websites, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

34. The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase. Facebook's Business Tools can also track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases. Advertisers can even create their own tracking parameters by building a "custom event."

35. One such Business Tool is the Facebook Tracking Pixel. Facebook offers this piece of code to advertisers, like Defendant, to integrate into their website. As the name implies, the Facebook Tracking Pixel "tracks the people and type of actions they take." When a user accesses a website hosting the Facebook Tracking Pixel, Facebook's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Facebook's servers. This second secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Facebook Tracking Pixel is configured to collect. This transmission is initiated by Facebook code and concurrent with the communications with the host website. At relevant times, two sets of code were thus automatically run as part of the browser's attempt to load and read lasikplus.com—Defendant's own code and Facebook's embedded code.

36. An example illustrates the point. Take an individual who, at relevant times, navigated to the Website and, as Plaintiff did, requested a consultation by clicking the "Book a Free Consultation" icon. When clicked, the individual's browser sent a GET request to Defendant's server requesting that server to load the particular webpage. As a result of

Defendant's use of the Facebook Tracking Pixel, Facebook's embedded code, written in JavaScript, sent secret instructions back to the individual's browser, without alerting the individual that this was happening. Facebook caused the browser to secretly duplicate the communication with Defendant, transmitting it to Facebook's servers, alongside additional information that transcribed the communication's content and the individual's identity. See Figure 1.

**Figure 1:**



37. As seen in Figure 1, through the Facebook Tracking Pixel, Defendant assists Facebook in receiving confidential information from consumers seeking to procure medical services, including their Facebook ID. This information includes, but is not necessarily limited to, a confirmation that a patient is scheduling a consultation for LASIK surgery, including the

date, time, and location of the consultation.

38.    After collecting and intercepting the information described in the preceding paragraph, Facebook processed it, analyzed it, and assimilated it into datasets like Core Audiences and Custom Audiences for targeted advertising purposes.

**C.    Defendant Assisted Facebook With Intercepting It's Patients PII and PHI**

39.     Through the Facebook Tracking Pixel, Defendant shared its patients' online activity, including their sensitive and confidential information and search results, including information related to the LASIK surgical procedures it provides.

40.    For example, as alleged above, when a patient entered the Website and requested a consultation,  Defendant transmitted information relating to the specific patient's consultation to Facebook via the Facebook Tracking Pixel.

41.    Each time Defendant sent this activity data, it also disclosed patients' PII, including their Facebook ID.  A Facebook ID is a unique and persistent identifier that Facebook assigns to each user.  With it, any ordinary person can look up the user's Facebook profile and name.  Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique Facebook ID, so too can any ordinary person who comes into possession of a Facebook ID.  Facebook admits as much on its website.  Indeed, ordinary persons who come into possession of the Facebook ID can connect to any Facebook profile.

42.    A user who accessed lasikplus.com/ while logged into Facebook transmitted what is known as a "c_user cookie" to Facebook, which contained that user's unencrypted Facebook ID.

43.    When a visitor's browser had recently logged out of an account, Facebook compelled the visitor's browser to send a smaller set of cookies.

44. One such cookie was the "fr cookie" which contained, at least, an encrypted Facebook ID and browser identifier. Facebook, at a minimum, used the fr cookie to identify users.

45. If a visitor had never created an account, an even smaller set of cookies was transmitted.

46. At each stage, Defendant also utilized the "_fbp cookie," which attached to a browser as a first-party cookie, and which Facebook used to identify a browser and a user.

47. The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website. Otherwise, the c_user cookie is cleared when the browser exits.

48. The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook. If that happens, the time resets, and another 90 days begins to accrue.

49. The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website. If that happens, the time resets, and another 90 days begins to accrue.

50. The Facebook Tracking Pixel used both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—i.e., lasikplus.com/. A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., www.facebook.com. The _fbp cookie was always transmitted as a first-party cookie. A duplicate _fbp cookie was sometimes sent as a third-party cookie, depending on whether the browser had recently logged into Facebook.

51. Facebook, at a minimum, used the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles. Defendant sent these identifiers alongside the event data.

**D.     Plaintiff Never Provided Defendant or Facebook with Consent to Intercept Her Sensitive and Confidential Personally Identifiable Information**

52.     Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose her confidential and sensitive PII.  Plaintiff was never provided with any written notice that Defendant disclosed the users of the Website nor was she provided with any means of opting out of such disclosures.  Defendant nonetheless knowingly disclosed to Facebook her sensitive and confidential PII.

53.     Facebook likewise never received consent to intercept sensitive, protected information.  In fact, Facebook expressly warrants the opposite, promising to shield that information from disclosure.

54.     When first signing up, a Facebook user assents to three agreements: the Terms of Service,  the Cookies Policy,  and the Data Policy.

55.     Facebook's Terms of Service begins by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."   The Terms of Service then prohibits anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent."

56.     Facebook's Data Policy recognizes that there may be "[d]ata with special protections," meaning information that "could be subject to special protections under the laws of your country."   The Data Policy goes on to describe how Facebook collects information from its "Meta Business Tools," including "our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel."   Specifically, Facebook acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."

57.     Facebook then offers an express representation: "We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us." Facebook does acknowledge collecting "data with special protections" to personalize ads, but critically, only sensitive information that users "choose to provide."

58.     Facebook's Cookies Policy ratifies those representations, stating "the Data Policy will apply to our processing of the data that we collect via cookies."

59.     Facebook's other representations further reinforce these warranties. In its Advertising Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting." And in a blog post titled "About Restricted Meta Business Tools Data," Facebook asserts it has "policies around the kinds of information businesses can share with us."   Facebook does not "want websites or apps sending us sensitive information about people."   Sensitive information includes, among other things, "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."

60.     These representations are repeated frequently.  Facebook created a "Help Center" to better explain its practices to users.  In an article titled, "How does Facebook receive information from other businesses and organizations?," Facebook reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Facebook "determine[s] that a business or an organization is violating our terms, we'll take action against that business or organization."  In another article, titled, "How does Meta work with data providers?," Facebook repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."

61.     Based on these representations, Facebook never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

## CLASS ACTION ALLEGATIONS

62.     Plaintiff seeks to represent a class defined as all persons in the United States who have a Facebook account and booked a consultation for LASIK surgery on the Website (the "Class").

63.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment to the complaint or narrowed at class certification.

64.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

65.     Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

66.     **Numerosity.** The members of the proposed Class are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable. Upon information and belief, Plaintiff reasonably estimates that there are thousands of individuals that are members of the proposed Class. Although the precise number of proposed members are

unknown to Plaintiff, the true number of members of the Class are known by Defendant. Members of the Class may be notified of the pendency of this action by mail and/or publication through the records of Defendant and third-party Facebook.

67.     **Typicality.**  The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all members of the Class, scheduled a consultation for LASIK surgery on the Website and had her confidential information disclosed to a third party.  The representative Plaintiff, like all members of the Class, has been damaged by Defendant's misconduct in the very same way as the members of the Class through the privacy violations alleged herein.  Further, the factual bases of Defendant's misconduct are common to all members of the Class and represent a common thread of misconduct resulting in injury to all members of the Class.

68.     **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class.  These common legal and factual questions include, but are not limited to, the following:

    a.  Whether Defendant intentionally tapped the lines of internet communication between patients and their healthcare provider;

    b.  Whether Defendant's Website surreptitiously recorded personally identifiable information, protected health information, and related communications and subsequently, or simultaneously, disclosed that information to Facebook;

    c.  Whether Facebook is a third-party eavesdroppers;

    d.  Whether Defendant's disclosures of personally identifiable information, protected health information, and related communications constituted an affirmative act of

communication;

e.  Whether Defendant's conduct, which allowed Facebook—an unauthorized person—to view Plaintiff's and Class Members' personally identifiable information and protected health information, resulted in a breach of confidentiality;

f.  Whether Defendant violated Plaintiff's and Class Members' privacy rights by using the Facebook Tracking Pixel to record and communicate patients' confidential medical communications; and

g.  Whether Defendant breached its duty owed to Plaintiff and the Class by disclosing their PII and PHI to Facebook.

69.  **Adequacy of Representation.**  Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class.  Plaintiff has no interests that are antagonistic to those of the Class.

70.  **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by members of the Class are relatively small compared to the burden and expense of individual litigation of her claims against Defendant.  It would, thus, be virtually impossible for members of the Class, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if members of the Class could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this

action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

71. In the alternative, the Class may be certified because:

(a) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the Defendant;

(b) the prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede her ability to protect her interests; and/or

(c) Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## **CAUSES OF ACTION**

### **COUNT I**
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2511(1), *et seq.***

72. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

73. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

74. The ECPA protects both sending and the receipt of communications.

75. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

19

76.     The transmission of Plaintiff's PII and PHI to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

77.     The transmission of PII and PHI between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

78.     The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

79.     The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

80.     The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

81.     The following instruments constitute "devices" within the meaning of the ECPA:

    a.     The computer codes and programs Facebook used to track Plaintiff and Class Members communications while they were navigating the Website;

    b.     Plaintiff's and Class Members' browsers;

    c.     Plaintiff's and Class Members' mobile devices;

    d.     Defendant and Facebook's web and ad servers;

      e.      The plan Defendant and Facebook carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

82.     Plaintiff and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

83.     By utilizing and embedding the Facebook Tracking Pixel on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

84.     Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications through the Facebook Tracking Pixel, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and PHI to third parties, such as Facebook.

85.     Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII and PHI, including their treatment information. This confidential information was then matched to patients' Facebook accounts and monetized for targeted advertising purposes.

86.     By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

87.     By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the

information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

88.　Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, among others.

89.　The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.　Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party.　HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[13]

90.　Plaintiff's information that Defendant disclosed to Facebook qualifies as IIHI, and Defendant violated Plaintiff's and Class Members' expectations of privacy.　Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6. Defendant used the wire or electronic communications to increase its profit margins.　Defendant specifically used the Facebook Tracking Pixel to track and utilize Plaintiff's and Class Members'

---

[13] 42 U.S.C. § 1320d-6.

PII and PHI for financial gain.

91.     Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

92.     Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy through the Facebook Tracking Pixel.  Plaintiff and Class Members, all of whom are patients of Defendant, had a reasonable expectation that Defendant would not redirect their communications to Facebook without their knowledge or consent.

93.     The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

94.     As a result of each and every violation thereof, on behalf of herself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq.* under 18 U.S.C. § 2520.

## COUNT II
### Negligence

95.     Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

96.     Defendant knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' PII and PHI, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, misused, and disclosed to unauthorized parties.

97.     As a provider of health care under the law, Defendant had a special relationship with Plaintiff and Class Members who entrusted Defendant to adequately protect their PII and PHI.

98.     Defendant knew that the PII and PHI at issue was private and confidential and should be protected as private and confidential.  Thus, Defendant owed a duty of care not to subject Plaintiff and Class Members to an unreasonable risk of unauthorized disclosure.

99.     Defendant knew, or should have known, of the risks inherent in collecting and storing PII and PHI and allowing it to be accessed by unauthorized third parties.

100.     Defendant's failure to take proper security measures to protect Plaintiff's and Class Members' PII and PHI created conditions conducive to a foreseeable risk of unauthorized access and disclosure of such confidential information to unauthorized third parties. As described above, Plaintiff and Class Members are part of a foreseeable, discernable group that was at high risk of having their confidential information compromised, and otherwise wrongly disclosed if not adequately protected by Defendant.

101.     Defendant had a duty under common law to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' PII and PHI.

102.     Defendant owed a duty to timely and adequately inform Plaintiff and Class Members, in the event of their PII and PHI being improperly disclosed to unauthorized third parties.

103.     Defendant systematically failed to provide adequate security for data in its possession or over which it had supervision and control.

104.     Defendant, through its actions and omissions, unlawfully breached duties to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' PII and PHI within Defendant's possession, supervision, and control.

105.     Defendant, through its actions and omissions, unlawfully breached duties owed to

Plaintiff and Class Members by failing to have appropriate procedures in place to prevent dissemination of Plaintiff's and Class Members' PII and PHI.

106.    Defendant, through its actions and omissions, unlawfully breached duties to timely and fully disclose to Plaintiff and Class Members that the PII and PHI within Defendant's possession, supervision, and control was improperly accessed by unauthorized third parties, the nature of this access, and precisely the type of information improperly accessed.

107.    Defendant's breach of duties owed to Plaintiff and Class Members proximately caused Plaintiff's and Class Members' PII and PHI to be compromised by being accessed by unauthorized third parties.

108.    As a result of Defendant's ongoing failure to adequately notify Plaintiff and Class Members regarding what type of PII and PHI has been compromised, Plaintiff and Class Members are unable to take the necessary precautions to mitigate damages.

109.    As a proximate result of Defendant's negligence and breach of duties as set forth above, Defendant's breaches of duty caused Plaintiff and Class Members to, inter alia, have their data shared with third parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their PII and PHI, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their PII and PHI, all of which can constitute actionable actual damages.

110.    In failing to secure Plaintiff's and Class Members' PII and PHI, Defendant is guilty of oppression, fraud, or malice. Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiff's and Class Members' rights.  Plaintiff, in addition to seeking actual damages, also seeks punitive damages on behalf of herself and the Class.

111. Defendant's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' PII and PHI, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiff and Class Members seek actual, compensatory, and punitive damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of the alleged Class, that the Court enter judgment in her favor and against Defendant as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative for the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order declaring that Defendant's conduct violates the causes of action referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any

and all issues in this action so triable as of right.

Dated:  December 10, 2024          Respectfully Submitted,


By: */s/ Stephen A. Beck*  _____
      Stephen A. Beck

**BURSOR & FISHER, P.A.**
Stephen A. Beck
Sarah N. Westcot (*pro hac vice* forthcoming)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
E-Mail: sbeck@bursor.com
      swestcot@bursor.com

*Attorneys for Plaintiff*